FILED !SG!
UC DISTRICT COURT CLERK
WESTERN DISTRICT OF KY

IN THE UNITED STATES DISTRICT COURT 05 DEC - 1 AM 9: 52
WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| BARON BARCLAY BRIDGE SUPPLIES, LLC )<br>Plaintiff, ) | |
| ) | Case No. *3:05CV-790-H* |
| ) | |
| ) | COMPLAINT |
| AMERICAN CONTRACT BRIDGE )<br>LEAGUE, INC. )<br>Defendant. ) | |
| ) | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, Baron Barclay Bridge Supplies, LLC ("Baron Barclay"), by its attorney, James

A. Babbitz, alleges as follows:

### I. JURISDICTION AND VENUE

1.    Plaintiff, Baron Barclay, is a Kentucky limited liability company with its principal place

of business at 3600 Chamberlain Lane, Suite 230, Louisville, Kentucky 40241.

2.    Defendant, American Contract Bridge League, Inc. ("ACBL"), designates itself as a not-

for-profit membership corporation, incorporated under the laws of the state of New York,

with its principal place of business at 2990 Airways Boulevard, Memphis, Tennessee

38116.

3.    Jurisdiction of this Court is founded upon 28 U.S.C. §§ 1331 and 1337(a), and upon

Sherman Act Sections 1 and 2, 15 U.S.C. §§ 1 and 2.

4.    This action is instituted against defendants under Sherman Act Sections 1 and 2, 15

U.S.C. §§ 1 and 2.

1

5.      Venue in this Court is proper under 28 U.S.C. §1391(a) and (c) as a substantial part of the

events and omissions giving rise to plaintiff's claims arose in this judicial district, and

defendant is subject to the personal jurisdiction of this Court.

II.      FACTS

6.      Baron Barclay is a retailer of books and other products described hereinafter involving

the game of bridge.

7.      ACBL designates itself as a not-for-profit membership corporation of bridge players.

8.      The game of bridge is a unique partnership card game played by four players with a

standard deck of 52 cards.  It is a card game that is hundreds of years old, began in the

16th century, and evolved from the British game of whist.

9.      The ACBL was founded in 1937.

10.     The game of bridge is highly complex in the bidding and the play of the cards, and

mastery of bridge requires education and teaching.

11.     Bridge books are used as instructional tools to learn how to play the game of bridge.

Bridge books are sold to individuals who want to play bridge, from the novice who is just

learning how to play, to the most advanced player.  Bridge books are used to teach and

learn advanced techniques of bidding and play at the intermediate and competitive levels.

Techniques and strategies on bidding and advanced play are particularly complex and

there are numerous bridge books just on bidding and other aspects of advanced play.

12.      The game is generally considered too complex for anyone to play competently without

instruction; therefore, bridge players are consumers of bridge books, and ACBL has

created a system whereby it attempts to be the exclusive source of bridge books for

2

bridge players.

13. ACBL was officially established to promote the game of bridge, and has become the largest bridge organization in the world, dominating the bridge book market in the United States through the tournament and masterpoint system that it has created. ACBL also maintains control over the sale of bridge books and teaching materials through its teacher accreditation program and its advertising and membership discounts.

14. The game of bridge is played at various levels, but at the competitive tournament level it is controlled and dominated by the ACBL through its masterpoint system and national tournaments.

15. Baron Barclay is ACBL's largest competitor in the sale of books on the game of bridge.

16. ACBL established the masterpoint/tournament system through which it maintains its control over the game of bridge played competitively. ACBL has exclusive control over this system of awarding masterpoints. Masterpoints are awarded for a player's performance at tournaments -- national, regional, or local. ACBL has exclusive control over the granting and recording of masterpoints awarded and has designated the types of honorary titles and categories within the masterpoint system. ACBL has exclusive control over national tournaments and "masterpoint races" for the competitive play of bridge.

17. A bridge player must be a member of ACBL in order to receive formal recognition of his or her status based on the number and type of masterpoints he or she has received. ACBL members earning masterpoints at competitive levels receive local and national recognition through ACBL.

3

18.     Bridge clubs must be members of ACBL in order to award masterpoints. ACBL has complete control over the certification of clubs that are permitted to award masterpoints. Thousands of local bridge clubs are affiliated with ACBL so that they can participate in the masterpoint system.

19.     ACBL sponsors national bridge tournaments, known as the North American Bridge Championships, as part of its masterpoint system (the "National Tournaments"). These tournaments attract thousands of players. ACBL has exclusive control over the National Tournaments. There are three National Tournaments annually. Thousands of competitive players of bridge who want to gain masterpoints and have them awarded and receive recognition compete at the National Tournaments.

20.     The National Tournaments provide ACBL with an exclusive market for the sale of its products, including books. At the National Tournaments, ACBL publishes a *Daily Bulletin* with the daily schedule of games to be played and scores attained, and ACBL advertises its own products in this publication. While Baron Barclay may be permitted to advertise in the *Daily Bulletin* at rates far in excess of the cost to ACBL for comparable advertising, it would be meaningless for it to do so because of the anticompetitive cost and because it is now barred by the ACBL from selling its products at the National Tournaments although in prior years it had been permitted to bid for and have a sales booth at National Tournaments.

21.     ACBL created and maintains control over the sale of computer programs for scoring tournaments as part of its masterpoint system. The program calculates masterpoints and registers the points with the ACBL. Only ACBL's computer programs are permitted by

the ACBL to tie into the ACBL scoring matrix to record masterpoints and to send reports directly to ACBL.  Bridge clubs use the ACBL program because ACBL, through its anticompetitive activities, controls the market so that no other program may provide this direct access.

22.   ACBL maintains control of the game of competitive bridge by sponsoring thousands of local and regional bridge clubs and tournaments.  It has a network of approximately 3300 bridge clubs, 1000 bridge tournaments, and 2.5 million tables of bridge in play annually in clubs and tournaments and 100,000 tables on line.

23.   The system of masterpoints and tournaments and the complexity of the play of bridge at the competitive level, make bridge books on the play of the game and on bidding a virtual necessity if a player wants to compete in tournaments and earn masterpoints.  ACBL has created this market for educational bridge books, and sells bridge books and publications, teaching books and educational materials to its members at a discount.  Members of ACBL get a discount on all but a few of the hundreds of products it sells.

24.   ACBL attempts to monopolize the market for bridge books, tournament supplies and computerized bridge games in various ways, including the following.

(a)   ACBL exclusively supplies the National Tournaments with tournament supplies, including playing cards, boards, convention cards, travelers, and recap sheets.  By exclusively supplying National Tournaments with tournament supplies, ACBL specifically excludes Baron Barclay from bidding for and selling its tournament supplies for use at ACBL National Tournaments;

5

(b)     ACBL exercises monopoly power over the sale of tournament supplies, including playing cards, boards, convention cards, travelers, and recap sheets at regional and sectional ACBL tournaments.  ACBL sells over 99% of tournament supplies purchased for use at regional and sectional ACBL tournaments.  On rare occasions a particular tournament director may assert his or her independence by ordering such products, particularly convention cards, from plaintiff;

(c)     ACBL is engaged in an illegal tying arrangement in that it has tied the sale of tournament supplies, the tied products, to all ACBL National Tournaments, the tying product or service;

(d)     ACBL is engaged in an illegal tying arrangement in that it has tied the sale of tournament supplies, the tied products, to ACBL regional and sectional tournaments, the tying product or service;

(e)     ACBL uses its power in the marketplace to persuade bridge clubs that award masterpoints to buy their tournament supplies from ACBL, including playing cards, boards, convention cards, travelers, and recap sheets.  ACBL is able to promote and encourage the sale of its products to thousands of bridge clubs because all bridge clubs that award masterpoints must be members of ACBL, and therefore, ACBL regularly communicates with all member bridge clubs to promote and advance its own products in violation of principles of fair competition.  ACBL also sells its own computer programs to bridge clubs certified by ACBL to award masterpoints, further exploiting its position in the market place;

6

(f)     ACBL is engaged in an illegal tying arrangement in that it has tied the sale of
tournament supplies, the tied products, to all ACBL-member bridge clubs --
national, regional and sectional -- the tying product or service;

(g)     ACBL publishes the *Bridge Bulletin*, a monthly magazine that is sent to every
ACBL member, and advertises its own books and products in every issue of this
publication.  ACBL annually publishes in the *Bridge Bulletin* a sales catalogue of
its books and bridge products called the *Bridge Source Product Guide*.  This
catalogue is always extensive, being 32 pages long in 2004;

(h)     Baron Barclay advertises in the *Bridge Bulletin*, and has been doing so for many
years.  ACBL has announced that it is sharply raising its advertising rate structure,
and is precipitously increasing rates in restraint of competition and in an attempt
to force Baron Barclay to stop or curtail its advertising in the *Bridge Bulletin*;

(i)     On January 10, 2005, and since that date, ACBL refused to let Baron Barclay,
ACBL's largest competitor, rent and establish a sales booth at a national
tournament to sell books and other bridge products, as Baron Barclay has done for
many years.  No business in competition with ACBL is now permitted to sell its
products at the National Tournaments.  In prior years, in violation of principles of
fair competition, Baron Barclay was permitted to bid for the right to set up a
booth at the National Tournaments, not simply rent a booth at a fair and
competitive price for the right to sell at the National Tournaments.  ACBL has
always had its own sales booth for which it does not have to bid or pay a rental
fee; and

7

    (j)       On December 2, 2004, ACBL refused, after demand by Baron Barclay, to rent its membership list to Baron Barclay although ACBL does rent its membership list to others.

25.    Because of ACBL's control over the game of bridge through its masterpoint/tournament system, it is difficult if not impossible to frame relief to create fair and open competition in the sale of bridge books, tournament supplies, computer programs, and other bridge paraphernalia, and therefore, ACBL should be banned from selling these products in order to promote free and fair competition in the marketplace.

26.    ACBL attempts to achieve monopoly power over bridge teacher certification through its Teacher Accreditation Program ("TAP") and related incentives, which include the following:

    (a)      ACBL certifies bridge teachers under its Teacher Accreditation Program ("TAP"). Only bridge teachers thus certified by ACBL can claim to be TAP certified;

    (b)      ACBL maintains monopoly control over the teaching of bridge through this certification program, and ACBL has tied the teacher certification program to the sale of bridge books and materials for teaching and education in various ways;

    (c)      Teachers certified by ACBL under TAP take a ten-hour seminar and receive their training using ACBL's teaching materials included in the ACBL Bridge Series of five texts and teacher manuals;

    (d)      Teachers thus trained by and certified by ACBL under the TAP program using only ACBL texts and materials, in turn use these texts to teach new players and sell or offer ACBL texts to new players as part of their bridge classes;

8

(e)     Under the Star Teacher Program of the ACBL, a teacher who submits the names of 100 or more students to ACBL for any one course of instruction (Club, Diamond, Heart, Spade or No Trump) becomes a star teacher for that course, and receives an additional discount on ACBL textbooks and is featured in the Bridge Teacher newsletter;

(f)     Teachers are also part of the tournament system, taking TAP seminars at the National Tournaments, using ACBL approved texts and materials in these seminars, receiving official ACBL certification upon completion of the seminar, and preparing their students to compete in the National Tournaments;

(g)     ACBL gives TAP-certified teachers special rewards, an ACBL Accredited Teacher patch or cash incentives and bonus points, for bringing new members to ACBL;

(h)     ACBL offers a Cooperative Advertising Program for its TAP- certified teachers, providing them with marketing resources, advertising templates, the Marketing Matters e-newsletter, sample press releases and publicity tips; and

(i)     ACBL gives TAP- certified teachers money when they open local ACBL-affiliated bridge clubs, hold tournaments, teach bridge through the use of ACBL teaching materials, and encourage students and club members to join ACBL.

### III.  TRADE AND COMMERCE

27.     Defendant transacts a major portion of its business in interstate commerce, and the acts and transactions of the defendant alleged herein involve and affect a substantial amount of interstate commerce and trade.  ACBL, being an organization with a national

membership and holding national bridge tournaments in cities throughout the United States, facilitates the flow of interstate trade and commerce of its members residing in the various states of the United States.

28.    Defendant transacts sales of bridge books and other bridge-related materials totaling approximately two million dollars annually, a substantial part of which was sold and shipped in interstate commerce to purchasers located throughout the United States.

29.    Purchasers residing outside the state of Tennessee have placed orders with ACBL for books, products, and/or materials through the Memphis, Tennessee catalogue order address.

IV. CLAIMS
COUNT I
SHERMAN ACT, SECTION 2
MONOPOLIZATION OR ATTEMPT TO MONOPOLIZE SALE OF
BRIDGE BOOKS AND OTHER PRODUCTS AT NATIONAL TOURNAMENTS

30.    Baron Barclay incorporates by reference the averments contained in paragraphs one through 29 as though set forth fully herein.

31.    ACBL has engaged in a continuing course of conduct with the specific intent to monopolize or attempt to monopolize interstate trade and commerce in regard to the sale of bridge books and other products at National Tournaments in violation of the Sherman Act Section 2, 15 U.S.C. § 2. Defendant has engaged in efforts to destroy competition, and in doing so, to prevent Baron Barclay, defendant's largest competitor, from selling bridge books, tournament supplies and computerized bridge games at the National Tournaments.

32.    ACBL has also created the masterpoint/tournament system which is an integral part of how it maintains exclusive control over the sale of bridge books and other products to bridge players who must be members of ACBL to participate and achieve status in ACBL's masterpoint system and receive formal recognition for successful competitive play at the National Tournaments.

33.    ACBL further has achieved monopoly power over the sale of teaching texts and educational materials through its teacher certification program by which bridge teachers are brought to National Tournaments for certification and there they purchase teaching texts and educational materials from ACBL which are a required part of their certification from ACBL.

34.    Therefore, the relevant product market is (a) bridge books for playing bridge at all levels including complex play of the game at a competitive level, (b) bridge books for learning and teaching bridge (c) computerized bridge games, and (d) scoring and other products used in the conduct of tournaments.

35.    The relevant geographic market is the National Tournaments.

36.    To effectuate its unlawful, exclusionary conduct to monopolize or to attempt to monopolize, defendant has engaged in a variety of practices, including but not limited to the following:

    (a)    Exercising complete monopoly power over the sale of bridge books, including books for playing bridge and books for teaching and learning bridge, and other bridge related products, including computerized bridge games and scoring and tournament products, at the National Tournaments, which defendant sponsors and

11

controls through its tournament and masterpoint system;

(b)  Dictating that only it is permitted to sell the aforesaid products at and for the National Tournaments.  It can engage in such exclusionary activity since defendant maintains exclusive control over the masterpoint system and competitive play of bridge at the National Tournaments and uses this system to exercise monopoly power at the National Tournaments;

(c)  Creating a captive market for the sale of bridge books and other products at National Tournaments by requiring all bridge players to become members of ACBL if they wish to achieve certification of their status of accomplishment for their performance at tournaments, thereby maintaining exclusive control over bridge players who want to be acknowledged for their participation in this masterpoint system and enter competitive play at National Tournaments;

(d)  Prohibiting Baron Barclay from selling bridge books or bridge-related products at the National Tournaments;

(e)  Prohibiting business entities in competition with ACBL from selling bridge books or bridge-related products at the National Tournaments;

(f)  Exclusively supplying the ACBL National Tournaments with tournament supplies, including playing cards, boards, convention cards, travelers, and recap sheets, and specifically excluding Baron Barclay from the opportunity to bid or negotiate the opportunity to and sell its tournament supplies to any ACBL National Tournaments;

(g)  Exclusively using its own computer program for calculating and registering

12

masterpoints at National Tournaments, and prohibiting Baron Barclay from selling its computer scoring program for use at National Tournaments. ACBL controls the computer scoring program market because it is the only program that ties into the ACBL scoring matrix to record masterpoints and to send reports directly to ACBL;

(h)     Publishing the *Daily Bulletin* at the National Tournaments with the daily schedules and scores, which exclusively advertises ACBL books and products; While Baron Barclay may be permitted to advertise in the *Daily Bulletin* at rates far in excess of the cost to ACBL for comparable advertising, it would be meaningless for it to do so because of the anticompetitive cost and because it is barred from having a sales booth and selling its products at the National Tournaments;

(i)     Raising the price of advertising in the *Bridge Bulletin* to monopolistic levels, in an attempt to exclude or curtail Baron Barclay from advertising in this essential publication and therefore from being able to compete in the market; and

(j)     Tying teacher certification to ACBL books and the tournament system, whereby teachers take Teacher Accreditation Program (TAP) seminars at the National Tournaments, use ACBL approved texts and materials in these seminars, receive official ACBL certification upon completion of the seminar, and prepare their students to compete in the National Tournaments, and at the National Tournaments the only seller of bridge books and other bridge products for purchase of these materials is the ACBL.

37. The restrictive and monopolistic trade practices described above bear no reasonable relation to the operation and sponsoring of the National Tournaments, and are not authorized by law.

38. The conduct alleged in paragraph 36 was done with the specific intent to monopolize the relevant product, bridge books for teaching and playing bridge, tournament supplies, computerized bridge games, and a computer scoring program in the defined market, the National Tournaments.

39. Defendant exercises exclusive control over the activities at the National Tournaments. Plaintiff, on information and belief, now that Baron Barclay and all other competitors have been excluded, alleges that defendant sells approximately 100 percent of all bridge books sold at the National Tournaments and 100 percent of tournament supplies, computerized bridge games, and a computer scoring program.

40. Because of ACBL's control over the game of bridge through its masterpoint/tournament system, it is difficult if not impossible to frame relief to create fair and open competition in the sale of bridge books, tournament supplies, computer programs, and other bridge products at National Tournaments, and therefore, ACBL should be banned from selling these products at National Tournaments in order to promote free and fair competition in the marketplace.

41. ACBL has created a virtually hermetically sealed environment at the National Tournaments in which to sell bridge books and related bridge products, fostered and maintained by the masterpoint system. ACBL has constructed an anticompetitive wall which it is becoming progressively more difficult for competitors to scale based on all of

14

the following: maintaining a captive market of thousands of members competing for masterpoint status who attend the National Tournaments, training teachers at National Tournaments who must buy ACBL teaching texts and who train students who use ACBL texts, and excluding any competitors from advertising in the *Daily Bulletin* which is published at National Tournaments and even excluding competitors from selling at these largest and most prestigious tournaments.

42.     Defendant has sufficient market power to monopolize or come dangerously close to monopolizing the defined market.

43.     Defendant has a dangerous probability of succeeding in monopolizing the defined market.

44.     Defendant has monopolized or attempted to monopolize the defined market, in violation of the Sherman Act Section 2, 15 U.S.C. § 2.

COUNT II
SHERMAN ACT, SECTION 2
MONOPOLIZATION OR ATTEMPT TO MONOPOLIZE SALE OF
BRIDGE BOOKS AND OTHER PRODUCTS IN THE NATIONAL MARKET

45.     Baron Barclay incorporates by reference the averments contained in paragraphs one through 44 as though set forth fully herein.

46.     ACBL has engaged in a continuing course of conduct with the specific intent to monopolize or attempt to monopolize interstate trade and commerce in regard to the sale of bridge books and other bridge products in the national market comprised of the continental United States.  Defendant has engaged in efforts to destroy competition and in doing so prevent Baron Barclay, defendant's largest competitor, from selling bridge books and other bridge-related products in the United States national market.

15

47.     ACBL has created the masterpoint/tournament system as a method of controlling the sale

of bridge books and other bridge products.  Bridge players who want to achieve

recognition for ability in the game of bridge must participate in ACBL's

masterpoint/tournament system.  They must be members of the ACBL to win various

types and amounts of masterpoints which they earn by participating in regional, sectional,

and national tournaments where the masterpoints are awarded.  The ACBL controls the

awarding of all masterpoints and the publicity of players who have reached certain levels

of achievement.  ACBL uses its exclusive position of control over masterpoints and

tournaments where masterpoints are awarded to monopolize the sale of its own bridge

books for learning and playing bridge and the sale of other teaching tools, including

computerized bridge games and teaching materials, to its members.

48.     ACBL further attempts to achieve monopoly power through its teacher certification

program by requiring that teachers certified by the ACBL in their Teacher Accreditation

Program (TAP) use only ACBL teaching texts and educational materials.

49.     Therefore, the relevant product market is (a) bridge books for playing bridge at all levels

including complex play of the game at a competitive level, (b) bridge books for learning

and teaching bridge (c) computerized bridge games, and (d) scoring and other products

used in the conduct of tournaments.

50.     The relevant geographic market is the national market comprised of the continental

United States.

51.     To effectuate its unlawful, exclusionary conduct to monopolize or to attempt to

monopolize, defendant has engaged in a variety of practices, including but not limited to

16

the following:

(a)     Establishing and exercising exclusive control over the ACBL system of

        masterpoints and National Tournaments for the competitive play of bridge;

(b)     Exercising monopoly power over the sale of bridge books in the national market

        in the continental United States, which it sponsors and controls through its

        masterpoint/tournament system, its teacher certification program, its advertising

        and its system of membership;

(c)     Requiring all bridge players to become members of ACBL if they wish to gain

        status through the masterpoint system for their performance at tournaments;

(d)     Requiring bridge clubs to join ACBL if they want to award masterpoints;

(e)     Maintaining control over the sale of computer programs for scoring tournaments

        as part of its masterpoint system to local bridge clubs.  Only ACBL's computer

        program ties into the ACBL scoring matrix to record masterpoints and to send

        reports directly to ACBL.  Bridge clubs use the ACBL program because ACBL,

        through its anticompetitive activities, controls the market so that no other program

        may provide this direct access;

(f)     Exercising monopoly power over the sale of tournament supplies, including

        playing cards, boards, convention cards, travelers, and recap sheets, to regional

        and sectional ACBL tournaments, and excluding Baron Barclay from more than

        99% of the market for tournament supplies for use at ACBL regional and

        sectional tournaments;

17

(g)    Using its power in the marketplace and its regular communications with all member bridge clubs to promote the sale of and encourage ACBL-member bridge clubs to buy their tournament supplies from ACBL, including playing cards, boards, convention cards, travelers, and recap sheets, in violation of principles of fair competition;

(h)    Exclusively using its own computer program for calculating and registering masterpoints at sectional and regional tournaments, and prohibiting Baron Barclay from selling its computer scoring program for use at ACBL tournaments. ACBL controls the computer scoring program because it is the only program that ties into the ACBL scoring matrix to record masterpoints and to send reports directly to ACBL;

(i)    Having exclusive control over all ACBL members and sending all members a copy of the *Bridge Bulletin* with ACBL advertising;

(j)    Promoting ACBL's books and bridge-related products in the *Bridge Bulletin* and disseminating its own extensive catalogue, the *Bridge Source Product Guide*, in the *Bridge Bulletin*;

(k)    Sharply raising the price of advertising in the *Bridge Bulletin* to monopolistic levels, in an attempt to exclude or curtail Baron Barclay from advertising in this essential publication and therefore competing in the market defined;

(l)    Holding monopoly power over the certification of bridge teachers under the ACBL Teacher Accreditation Program (TAP);

(m)   Training ACBL TAP-certified teachers by exclusively using ACBL's required teaching materials included in the ACBL Bridge Series of five texts and teacher manuals;

(n)   Tying teacher certification to ACBL books and the tournament system, whereby teachers take TAP seminars at the National Tournaments, use ACBL approved texts and materials in these seminars, receive official ACBL certification upon completion of the seminar, and prepare their students to compete in the National Tournaments;

(o)   Offering anticompetitive incentives under the Star Teacher Program, whereby a teacher who submits the names of 100 or more students to ACBL for any one course of instruction (Club, Diamond, Heart, Spade or No Trump) becomes a star teacher for that course, and receives an additional discount on ACBL textbooks and is featured in the Bridge Teacher newsletter;

(p)   Giving TAP-certified teachers special rewards, an ACBL Accredited Teacher patch or cash incentives and bonus points, for bringing new members to ACBL;

(q)   Offering a Cooperative Advertising Program for its TAP- certified teachers, and providing them with marketing resources, advertising templates, the Marketing Matters e-newsletter, sample press releases and publicity tips;

(r)   Giving TAP- certified teachers money when they open local ACBL-affiliated bridge clubs, hold tournaments, teach bridge through the use of ACBL teaching materials, and encourage students and club members to join ACBL; and

(s)     Refusing to rent its membership list to Baron Barclay, after demand from Baron Barclay, when it rents its membership list to others.

52.     The restrictive and monopolistic trade practices, as described above, taken together, constitute predatory practices which attempt to monopolize the sale of bridge books and bridge related supplies in the United States national market, and are not authorized by law.

53.     The conduct alleged in paragraph 51 was done with the specific intent to monopolize the relevant product, the sale of bridge books for teaching and playing bridge and other bridge-related products, in the defined market, the continental United States.

54.     Defendant exercises control over the sale of bridge books in the national market in the continental United States.  Baron Barclay, ACBL's largest competitor, has been excluded by ACBL from selling at the National Tournaments and is being forced out of advertising in the *Bridge Bulletin* by prohibitively high advertising rates.

55.     ACBL maintains its control over the sale of bridge books, tournament supplies, computerized bridge games, and other bridge-related products in the defined market by using its power in the marketplace to persuade bridge clubs that award masterpoints to buy tournament supplies (playing cards, boards, convention cards, travelers, recap sheets) from ACBL and use ACBL's own computer program for scoring and recording masterpoints because only ACBL's computer program ties into the ACBL scoring matrix to record masterpoints and to send reports directly to ACBL.

56.     ACBL exercises monopoly power over the market of bridge books for teaching and education, and Baron Barclay is excluded from selling teaching manuals or student texts

20

to any teacher certified under TAP by ACBL in the defined market because TAP certified teachers use only the ACBL Bridge Series of five texts and teacher manuals. ACBL promotes the exclusive use of its teaching texts by offering anticompetitive discounts, special rewards, and incentives to TAP-certified teachers.

57.    ACBL, through its teacher certification program (TAP), exclusively uses ACBL texts and teaching materials to train TAP-certified teachers and promotes the use and sale of the ACBL Bridge Series, as authorized by ACBL, by TAP certified teachers to students in their classes.

58.    Plaintiff, on information and belief, alleges that defendant sells approximately 60 percent of all bridge books for teaching and education sold in the continental United States.

59.    Because of ACBL's control over the game of bridge through its masterpoint/tournament system and its control over the accreditation of teachers, it is difficult if not impossible to frame relief to foster fair and open competition in the sale of bridge books for teaching and learning, and therefore, ACBL should be banned from selling these products in order to promote free and fair competition in the marketplace.

60.    Defendant has sufficient market power to monopolize or come dangerously close to monopolizing the defined market.

61.    Defendant has a dangerous probability of succeeding in monopolizing the defined market.

62.    Defendant has monopolized or attempted to monopolize the defined market, the national bridge market in the continental United States, in violation of the Sherman Act Section 2, 15 U.S.C. § 2.

COUNT III
SHERMAN ACT, SECTION 1
ILLEGAL TYING ARRANGEMENT: TEACHER CERTIFICATION

63.    Baron Barclay incorporates by reference the averments contained in paragraphs one through 62 as though set forth fully herein.

64.    ACBL has engaged in an illegal tying arrangement in that two distinct products or services – teaching certification and teaching books -- are tied such that TAP certified bridge teachers receive training in a ten-hour seminar using the official ACBL's teaching materials included in the ACBL Bridge Series of five texts and teacher manuals. They are trained exclusively with these texts if they wish to receive official TAP certification from ACBL.

65.    To effectuate its unlawful tying practices, all in unreasonable restraint of the above described trade and commerce in bridge books and supplies, defendant has engaged in a variety of practices, including but not limited to the following:

(a)    ACBL exercises monopoly power over bridge teacher certification through its Teacher Accreditation Program ("TAP"). Teachers come to National Tournaments for official ACBL certification;

(b)    Teachers certified by ACBL under the TAP program receive training using only ACBL's teaching materials included in the ACBL Bridge Series of five texts and teacher manuals. Only teachers who participate in the seminar and use ACBL's Bridge Series receive a designation that they are certified as a TAP teacher by ACBL;

22

(c)     The TAP seminars are held at the National Tournaments where only ACBL sells
bridge books for teaching and playing bridge.  Special seminars and workshops
are offered at all National Tournaments for the continuing education of bridge
teachers;

(d)     ACBL promotes the use of only ACBL teaching texts by TAP-certified bridge
teachers by the use of special discounts, rewards, star teacher bonuses, and other
teacher incentives.  ACBL develops and provides bridge support materials to
assist ACBL Accredited Teachers in presenting the ACBL beginning bridge
courses;

(e)     ACBL offers anticompetitive incentives under the Star Teacher Program, whereby
a teacher who submits the names of 100 or more students to ACBL for any one
course of instruction (Club, Diamond, Heart, Spade or No Trump) becomes a star
teacher for that course, and receives an additional discount on ACBL textbooks
and is featured in the Bridge Teacher newsletter;

(f)     ACBL helps their TAP-certified teachers obtain students and gives teachers
certified under the TAP program special rewards, ACBL Accredited Teacher
patch, cash incentives and bonus points for bringing new members to ACBL;

(g)     ACBL bridge units and districts have been asked by ACBL to appoint an
education liaison to work with ACBL in the promotion of ACBL education
programs at both the unit and district levels, and sponsor a TAP seminar at which
only ACBL teaching texts in the ACBL Bridge Series are used; and

(h)     ACBL offers a Cooperative Advertising Program for their TAP-certified teachers, providing them with marketing resources, advertising templates, the Marketing Matters e-newsletter, sample press releases and publicity tips.

66.   The conduct alleged above constitutes an unlawful tying arrangement in that defendant has sufficient economic power in the tying market, the certification of bridge teachers, to impose restrictions in the tied product market, the sale of bridge books comprised of student texts and teacher manuals, and a substantial volume of commerce in said market is in fact restrained.  The defendant threatens to continue and will continue to enter into such unlawful tying arrangements in the trade and commerce of bridge books including student texts and teacher manuals in violation of the Sherman Act Section 1 unless the relief hereinafter prayed for in this complaint is granted.

67.   The aforesaid tying arrangement has had the following effects:

(a)     ACBL has monopoly power in the market of bridge books comprised of student texts and teacher manuals, by requiring that its TAP-certified teachers use only ACBL teaching books and student texts, thereby attempting to exclude Baron Barclay from the sale of teaching texts for bridge;

(b)     The teacher certification program under TAP discourages teachers from utilizing any of Baron Barclay's bridge texts, whether student texts or teaching manuals, and promotes the sale of ACBL texts by persuading teachers to purchase only from ACBL because of anticompetitive discounts, rewards, and incentives that ACBL offers; and

24

(c)     ACBL exercises monopoly power such that competition is severely restricted in the bridge book market for student texts and teaching manuals because of this illegal tying arrangement.

68.     Because of ACBL's control over the game of bridge through its masterpoint/tournament system and its control over the accreditation of teachers, it is difficult if not impossible to frame relief to foster fair and open competition in the sale of bridge books for teaching and learning, and therefore, ACBL should be banned from selling these products in order to promote free and fair competition in the marketplace.

69.     Therefore, defendant has engaged in an unlawful tying arrangement in violation of the Sherman Act Section 1, 15 U.S.C. § 1.

## COUNT IV
### SHERMAN ACT, SECTION 1
### ILLEGAL TYING ARRANGEMENT: TOURNAMENT SUPPLIES

70.     Baron Barclay incorporates by reference the averments contained in paragraphs one through 69 as though set forth fully herein.

71.     ACBL has engaged in an illegal tying arrangement in that two distinct products or services – tournaments and tournament supplies -- are tied such that all ACBL National Tournaments must exclusively use ACBL tournament supplies, including playing cards, boards, convention cards, travelers, and recap sheets, and Baron Barclay is excluded from negotiating or bidding on contracts for the sale of tournament supplies and excluded from selling any of its tournament supplies for use at any ACBL National Tournament.

72.     ACBL has engaged in an illegal tying arrangement in that two distinct products or services - tournaments and tournament supplies – are tied such that ACBL exercises

25

monopoly power over regional and sectional ACBL tournaments, supplying over 99% of tournament supplies, including playing cards, boards, convention cards, travelers, and recap sheets, to these ACBL tournaments, and excluding Baron Barclay from over 99% of the market in tournament supplies for regional and sectional ACBL tournaments.

73.   ACBL has also illegally tied the sale of tournament supplies, the tied product, to ACBL-member bridge clubs by using its market power to persuade bridge clubs to use only ACBL tournament supplies.

74.   To effectuate its unlawful tying practices, all in unreasonable restraint of the above described trade and commerce in tournament supplies, including playing cards, boards, convention cards, travelers, and recap sheets, defendant has engaged in a variety of practices, including but not limited to the following:

   (a)   ACBL exclusively supplies the National Tournaments with tournament supplies, including playing cards, boards, convention cards, travelers, and recap sheets, and excludes Baron Barclay from bidding on contracts for the sale of tournament supplies and excluded from selling any of its tournament supplies for use at any ACBL National Tournament.

   (b)   ACBL is engaged in an illegal tying arrangement in that it has tied the sale of tournament supplies, the tied products, to all ACBL National Tournaments, the tying product or service;

   (c)   ACBL exercises monopoly power over the sale of tournament supplies, including playing cards, boards, convention cards, travelers, and recap sheets, at regional and sectional ACBL tournaments, excluding Baron Barclay from more than 99%

of the market for tournament supplies for use at ACBL regional and sectional tournaments;

(d)    ACBL is engaged in an illegal tying arrangement in that it has tied the sale of tournament supplies, the tied products, to ACBL regional and sectional tournaments, the tying product or service;

(e)    ACBL uses its power in the marketplace to persuade bridge clubs that award masterpoints to buy their tournament supplies from ACBL, including playing cards, boards, convention cards, travelers, and recap sheets. ACBL is able to promote and encourage the sale of its products to thousands of bridge clubs because all bridge clubs that award masterpoints must be members of ACBL, and therefore, ACBL regularly communicates with all member bridge clubs to promote and advance its own products in violation of principles of fair competition; and

(f)    ACBL also sells its own computer program for calculating and registering masterpoints to bridge clubs that are certified by ACBL to award masterpoints, exploiting its position as the parent organization of these bridge clubs. It is the only program that is permitted to tie into the ACBL scoring matrix to record masterpoints and to send reports directly to ACBL. Bridge clubs use the ACBL program because ACBL, through its anticompetitive activities, controls the market so that no other program may provide this direct access.

75.    The conduct alleged above is an unlawful tying arrangement in that defendant has sufficient economic power in the tying market, the tournament market, to impose

restrictions in the tied product market, the sale of supplies for use at bridge tournaments, and a substantial volume of commerce in said market is in fact restrained. The defendant threatens to continue and will continue to enter into such unlawful tying arrangements in the trade and commerce of tournament supplies in violation of the Sherman Act Section 1 unless the relief hereinafter prayed for in this complaint is granted.

76.   The aforesaid tying arrangement has had the following effects:

(a)   ACBL exclusively supplies the National Tournaments with tournament supplies, including playing cards, boards, convention cards, travelers, and recap sheets, and excludes Baron Barclay from bidding on contracts for the sale of tournament supplies and excluded from selling any of its tournament supplies for use at any ACBL National Tournament;

(b)   ACBL exercises monopoly power over the sale of tournament supplies, including playing cards, boards, convention cards, travelers, and recap sheets, at regional and sectional ACBL tournaments, excluding Baron Barclay from more than 99% of the market for tournament supplies for use at ACBL regional and sectional tournaments;

(c)   ACBL uses its power in the marketplace to promote and encourage the sale of its tournament supplies to thousands of ACBL-member bridge clubs by using its regular communications with all member bridge clubs in violation of principles of fair competition;

(d)   ACBL uses only its own computer program for scoring masterpoints at national, regional, and sectional tournaments. Baron Barclay is excluded from selling its

28

own computer program at any ACBL tournament;

(e)   ACBL exercises monopoly control over the computer program for scoring masterpoints at tournaments because it is the only program that ACBL will allow to tie into the ACBL scoring matrix to record masterpoints and to send reports directly to ACBL;

(f)   ACBL-member bridge clubs use the ACBL computer scoring program because no other program will provide direct access to the ACBL scoring matrix to record masterpoints and to send reports directly to ACBL, thereby excluding Baron Barclay from selling its own computer program to ACBL-member bridge clubs;

(g)   No competition can exist in the tournament supplies market because of this illegal tying arrangement; and

(h)   No competition can exist for the computer scoring program because of this illegal tying arrangement.

77.   Because of ACBL's control over the game of bridge through its masterpoint/tournament system, it is difficult if not impossible to frame relief to foster fair and open competition in the sale of bridge books, tournament supplies, computer programs, and other bridge paraphernalia, and therefore, ACBL should be banned from selling these products in order to promote free and fair competition in the marketplace.

78.   Therefore, defendant has engaged in an unlawful tying arrangement in violation of the Sherman Act Section 1, 15 U.S.C. § 1.

WHEREFORE, plaintiff prays for judgment against defendant as follows:

(a)    Adjudge and decree that defendant has engaged in a monopoly or an attempt to monopolize the sale of bridge books and supplies in the national bridge tournament market in violation of Section 2 of the Sherman Act;

(b)    Adjudge and decree that the defendant has used the masterpoint/tournament system to monopolize or attempt to monopolize the sale of bridge books, tournament supplies, products for scoring tournaments, a computer program for scoring tournaments, and other bridge-related products;

(c)    Adjudge and decree that defendant has engaged in a monopoly or an attempt to monopolize the sale of bridge books and other bridge-related products in the national United States market in violation of Section 2 of the Sherman Act;

(d)    Enjoin, temporarily until trial and permanently thereafter, all violations of defendant of the antitrust laws;

(e)    Adjudge and decree that the defendant has engaged in tying practices involving the sale of instructional bridge books in violation of Section 1 of the Sherman Act;

(f)    Adjudge and decree that the defendant has engaged in tying practices involving the sale of tournament supplies in violation of Section 1 of the Sherman Act;

(g)    Enjoin ACBL from the sale of bridge books, tournament supplies, computer programs, and other bridge paraphernalia;

(h)    Award to plaintiff and against defendant three times the total amount of damages determined to have been sustained;

(i)    Award to plaintiff and against defendant the costs of suit and reasonable

attorneys' fees;

(j)    Award plaintiff pre and post judgment interest; and

(k)    Grant such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted,

James A. Babbitz
CONLIFFE, SANDMANN & SULLIVAN
4169 Westport Road
Louisville, KY  40207
(502) 896-2966
Attorneys for Plaintiff,
Baron Barclay Bridge Supplies, LLC

Of Counsel:

KRAMER & KRAMER, LLP
Mitchell A. Kramer
1077 Rydal Road
Suite 100
Rydal, PA 19046
(215) 887-9030
        and
Barbara H. Kramer
24 Frank Lloyd Wright Drive
Lobby D
Ann Arbor, MI 48105-9755
(734) 930-5452